Eve Preminger, J.
Defendants are employees of an adult book store in the downtown area which specializes in viewing machines for "peep shows.” They move to dismiss three health and building code violations on the ground that the summonses were issued pursuant to a plan of selective and discriminatory law enforcement of the Administrative Code of the City of New York against "sex related” establishments.
The papers submitted by defendants to support this claim consist primarily of references to criminal charges pending elsewhere against these and additional defendants who own or work in "sex related” establishments in the midtown area. As an initial obstacle to granting the relief requested the court finds an insufficient connection between the activities of the Midtown Task Force complained of by defendants and the summonses issued against them in their downtown store. However, this deficiency is to some extent cured by the answering papers, where the Corporation Counsel acknowledges that the instant summonses resulted from the efforts of the Midtown Task Force. This statement also lends support to the defendants’ contention that the concentrated enforcement efforts of the Midtown Task Force are specifically directed against "sex related” establishments rather than against all businesses in the midtown area. Indeed, the People do not directly deny this. They claim, however, that the Midtown Task Force’s concentrated prosecution of health and building violations against certain establishments is a legitimate response to the public concern over conditions in the midtown area which include the recognized, long-standing problem of the high incidence of crime and general deterioration of the area associated with the proliferation of businesses catering to commercial sex. They also submit statistics demonstrating that even with this emphasis of enforcement upon Midtown Task Force work, such summonses constituted only a small fraction of the over 17,000 Administrative Code summonses docketed in New York County in the past year.
*441 Defendants contend that they have met their initial burden of alleging sufficient facts regarding discriminatory enforcement to entitle them to a hearing. They rely primarily upon statements to the press of mayoral assistant Sidney Baumgarten, the project director of the Midtown Enforcement Project, such as: "Despite all constitutional limitations we stop at nothing when we try to put these people out of business.”
It is apparently defendants’ contention that this and similar statements are enough to entitle them to a hearing on discriminatory enforcement, pursuant to People v Utica Daw’s Drug Co. (16 AD2d 12) and subsequent cases. The court sees little need for a hearing however, since the legal issues presented are not controlled by press release or political bombast. There is clearly no need for a hearing to determine whether the director of the Midtown Enforcement Project or any law enforcement officer is bound by constitutional limitations, regardless of unfortunate remarks to the contrary. The question is only whether those constitutional boundaries have been violated by the enforcement activities here conducted. A hearing is unnecessary to resolve that issue when there is no real dispute as to the activities themselves.
The People readily concede that there is an intentional emphasis on prosecution present in the instant situation. The facts, insofar as they are in dispute, are being considered most favorably to defendants and present the strictly legal question whether, given the city’s limited resources and inability to prosecute all Administrative Code violations, the decision to deploy the resources of the Midtown Enforcement Project against sex-related establishments was a legitimate exercise of prosecutional power or a violation of defendants’ right to nondiscriminatory prosecution under the Fourteenth Amendment.
The principle that the equal protection clause is directed to every form of State action, whether legislative, executive or judicial, is as old as the Fourteenth Amendment itself. (Matter of Virginia, 100 US 339, 347.) In the landmark case of Yick Wo v Hopkins (118 US 356) the Supreme Court recognized that a statute, valid on its face, could be rendered invalid as violative of the equal protection clause because of unequal enforcement of its provisions. Since then, both the Supreme Court (Sunday Lake Iron Co. v Wakeñeld, 247 US 350; Mackay Tel. Co. v Little Rock, 250 US 94; Snowden v Hughes, 321 US 1); and our Court of Appeals (People v Friedman, 302 *442 NY 75, app dsmd 341 US 907) have held that not all types of unequal enforcement of criminal statutes are to be condemned. It is recognized that a prosecutor may be unable to proceed against all violators and it has therefore been held that mere nonenforcement against some classes of citizens does not render prosecution against another class invalid. (People v Goodman, 31 NY2d 262.) To sustain a claim of unconstitutional selective enforcement defendant must prove not only nonenforcement against others, but that enforcement against him and his class is part of a deliberate or "systematic” and "purposeful” discrimination. (People v Walker, 14 NY2d 901.) Whether the burden of proving "purposeful” discrimination is to be tested by an objective or subjective standard is immaterial in the instant case, for the People concede these defendants have been purposefully selected for "emphasis.”
Having overcome the hurdle of showing purposeful selective enforcement against a particular class, the defendants are not yet exempt from prosecution. They also must demonstrate that the decision to concentrate enforcement upon members of their class was "based upon an unjustifiable standard such as race, religion, or other arbitrary classification.” (Oyler v Boles, 368 US 448, 456; Di Maggio v Brown, 19 NY2d 283, 290.)
It is relatively easy to decide whether a classification is based on impermissible racial, religious or political grounds. (See, e.g., People v Harris, 182 Cal App 2d 837; United States v Crowthers, 456 F2d 1074.) However, no such contention is made in the instant case. Whether a particular classification is otherwise "arbitrary” or "unjustifiable” is more difficult to determine. Prior cases have given us few guidelines. It has been suggested that the test should be identical to that applied to a statute in judging its constitutionality, and that any distinction that a Legislature could reasonably create is permissible for the executive or prosecutor. (See, e.g., Taylor v City of Pine Bluff, 266 Ark 309, 312, cert den 352 US 894, where the court approved the prosecutor’s decision to enforce its Sunday laws only against grocery stores on the ground that the Legislature would have been entitled to enact a statute applying only to grocery stores.) This court disagrees with such a test. To say that the prosecutor has a range of discretion equal to that of the Legislature is not to say that it is identical. To equate the two is to permit the prosecutor to abrogate or change legislative decisions at will. The test of *443 whether a prosecutor has made a reasonable classification would better be judged along more traditional lines of permissible prosecutional discretion, i.e., police resources, the social value of a particular conviction as against the time and expense to the State, the value of a "striking” example, etc. (See, e.g., People v Utica Daw’s Drug Co., 16 AD2d 12, supra; Newman v United States, 382 F2d 479; 61 Col L Rev 1103, 1119-1121; Breitel, 27 U Chi L Rev 427.)
If one adds to these criteria the more catholic test of whether a particular classification bears a rational relationship to the broad purposes of the criminal law and is reasonably related to law enforcement objectives, as much guidance from general principles as exists will be available in judging the facts presented in a particular case.
Turning to the specific situation involved herein, the Midtown Enforcement Project is Federally funded through a grant from the Law Enforcement Assistance Administration, with its mandate the "identification, investigation, and prosecution of illegal activities endemic to the midtown area of New York County.” The city has found that efforts to curtail these illegal activities have been ineffective in the past because of fragmented efforts and serious manpower shortages in the various enforcement agencies. It was therefore determined to concentrate efforts on insuring compliance with safety and health related ordinances. To that end, an inspectional task force known as the Midtown Task Force (which served the summonses herein) was established. This task force consists of one inspector each from the buildings department, fire department, health department and department of public works, operating under the supervision of a police officer. It simultaneously conducts frequent, regular inspections for all types of violations. It cannot be seriously doubted that this concentrated effort, even assuming it is aimed at sex-related establishments, is rationally related to legitimate law enforcement objectives. Any area of activity that carries with it a high incidence of crime is an appropriate choice for strenuous law enforcement. (See United States v Sacco, 428 F2d 264, cert den 400 US 903, where the court approved the decision to concentrate enforcement upon individuals suspected of belonging to organized crime on identical reasoning; see, also, People v Utica Daw’s Drug Co., 16 AD2d 12, 21, supra.) It must be remembered that this is not a situation where a law customarily ignored and fallen into desuetude has been revived to *444 penalize these defendants. (People v Acme Markets, 37 NY2d 326.) It is beyond doubt that health and building codes are well within the police power and necessary to regulate the public health, safety and welfare. (Nebbia v New York, 291 US 502.) Until the city has the financial, administrative and manpower resources to vigorously prosecute all such offenses, the selective enforcement decided upon herein would seem to be both rational and permissible.
The defendants’ motion is, therefore, denied.