THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RAYMOND L. CARTER, JR., Defendant-Appellant.

First District (4th Division)   No. 61425

Opinion filed February 2, 1978.

Dean Dimitri and Tim Biasiello, both of Berwyn, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, James S. Veldman, and William F. Ward, Jr., Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

After a jury trial in the circuit court of Cook County, defendant, Raymond L. Carter, Jr., was found guilty of murder (Ill. Rev. Stat. 1971, ch. 38, par. 9—1). Subsequently he was sentenced to a term of 30 to 60

years. The issues for review are: (1) whether defendant was found guilty beyond a reasonable doubt; and (2) whether there was a material variance between the indictment and the proof adduced at trial.

We affirm.

Prosecution witnesses established that on March 6, 1973, at about 4 a.m., defendant awakened the occupants of a home directly across the street from 1246 Clinton in Berwyn, Illinois. He told them he was returning home from work and heard a woman screaming in the building across the street and asked them to call the police. Defendant told the officer who responded to the call that, shortly after hearing a woman scream, he saw a man run from the side door of the building. He described the man as being in his mid-20's, about 5 feet 9 inches tall, and having a medium build. He also described that person as having long blond hair with dark roots and that he was wearing a black jacket and dark pants.

While defendant remained outside, the officer went into the building at 1246 Clinton and discovered the body of the victim, Christine Heckmann, age 23, lying on the floor. She was naked from the waist down, her bra was pushed up exposing her breasts and a rug covered the top half of her body. Her clothes were on the floor nearby, and the walls and ceiling were spattered with blood. The victim exhibited some signs of life when the officer arrived, but she was pronounced dead on arrival at the hospital. The police officer then accompanied defendant to his nearby home and asked to use the telephone.

The autopsy report stated death was caused by severe skull fractures and cerebral lacerations resulting from multiple, blunt impacts to the head of the victim. The report also stated there were abrasions on the victim's thighs, as well as scuff marks in that area.

Later the same day, defendant voluntarily answered questions at the police station. A composite sketch of the man defendant said he saw running away from the victim's apartment was made but the description given by defendant was materially different than the description he had first given, and it bore a strong resemblance to defendant. When the discrepancies were called to his attention, defendant stated, "I killed her."

Defendant's confession was taken at 4:45 p.m. on March 6, 1973, little more than 12 hours after the crime was discovered. He stated he was aware of the legal consequences of his statement and that he had received both food and drink when he requested it during the day. He stated he was at a friend's house about 3 hours before leaving about 1 a.m. After walking around, he went to the victim's apartment and found the rear door unlocked. He went inside the living room and found the victim asleep on the couch. He stated she was clothed in a dark-blue blouse and checkered slacks. He hit her repeatedly with his fists and then went blank. When he left her apartment about 3:50 a.m., the victim was lying on the

floor naked from the waist down and her bra was pushed up. Her face was puffed up and a rug partially covered her body. He stated he did not remember taking off her clothes or having sexual relations with her, but he could have done so. He admitted he did not see anyone run from the building as he had first told police.

Prior to taking his statement, it was noticed defendant had brown spots that appeared to be dried blood on his pants. His shirt, which was subsequently found in the hamper in his home, also had bloodstains. A laboratory technician testified the stains found on defendant's shirt, on the outside of his pants and on the inside of the crotch area of his pants were Type A blood, the same type as the victim's, and was a type common to approximately 40% of the population. The technician further testified that hair recovered from defendant's clothing was comparable to that of the victim; however, no sperm was found on either the victim's or defendant's clothing, and the ring defendant wore on the little finger of his right hand was not damaged and did not contain any bloodstains.

A search of garbage cans and rooftops in the area failed to disclose the weapon used to inflict the victim's injuries, even after defendant's attorney told police it could be found on a rooftop in a particular block. It was also determined that defendant was about 70 feet from the place he stated he saw the man running from the side door, and the area was illuminated only by two widely separated streetlights. The side door referred to by defendant was locked from the inside.

At trial, defendant's mother testified she was awakened at about 4:30 a.m. on March 6, 1973, and defendant told her there was nothing the matter, but a policeman wanted to use the telephone. Defendant told her he thought he had heard a woman scream and ran into the apartment where he saw the woman lying on the floor. There was blood all over her face, and she looked as if she had been shot in the eye. He said he then ran across the street and told the people there to call the police.

She further testified she went to the police station later the same day at about 6 p.m. and was told defendant was being held for the crime. When she asked him how he was, defendant said, "all right, mom, but I'm all mixed up." He told her he had nothing to eat in the 10 hours he had been there, but was not hungry. When defendant's statement was placed in front of him, she told him not to sign it, and he said he would not.

Defendant testified at trial that after visiting a friend's house he was walking down the street and heard a moaning sound. He walked toward the back of the building and knocked on the door. When there was no answer, he pushed the door open and walked in. The woman was lying on the floor, and he knelt beside her to see if she was alive. He then went across the street and told the police there to call the police.

Defendant testified that when he was being questioned by police he

became confused. First, he had denied killing the victim and then told them he did it. He denied the confession was a true account of what happened and he reiterated his denial of the killing. He also denied touching the victim when he knelt down and stated he had not noticed how she was dressed. However, he admitted telling the police about a man running from the apartment even though he conceded there was no such man, and he had lied when he told this story to the people who lived across the street from the victim, to the police, and to his mother.

On rebuttal, a police officer testified that when the confession was being given, he asked defendant if he was trying to tell them something when he gave details for the composite sketch so as to resemble himself. Defendant responded he thought they would have caught on sooner.

Defendant contends he was not proved guilty beyond a reasonable doubt because the only evidence against him was the repudiated confession which stated he hit the victim with his fists and the autopsy report which stated the victim died from injuries inflicted by a blunt instrument. Defendant contends the injuries suffered by the victim could not have been caused by his fists, and thus the State failed to prove that he committed the acts which resulted in the death of the victim. He relies upon the fact that no murder weapon was found, upon the testimony of the laboratory technician that the ring he was wearing was not bent or bloodstained, and upon the fact that his fists were not cut or bruised.

■■ Defendant's confession that he killed the victim with his fists was not corroborated by the autopsy report which stated a blunt instrument was used. However, a confession need not be accepted or rejected *in toto*, and the credibility of a confession is for the trier of fact; the jury may accept all, parts or none of the confession. (*People v. DiGerlando* (1964), 30 Ill. 2d 544, 551, 198 N.E.2d 503.) Any discrepancy between defendant's confession and the evidence is for the jury to consider in assessing the degree of credibility to afford the confession. *People v. Hester* (1968), 39 Ill. 2d 489, 511, 237 N.E.2d 466.

In this case, defendant's confession stated that he hit the victim with his fists several times and then blacked out. The jury may have believed the central feature of defendant's confession that he killed the victim, but disbelieved the fact that he did so only with his fists.

Defendant's confession that he killed the victim was corroborated by his detailed knowledge of the scene of the crime and by physical evidence. Defendant testified at trial that he had gone inside the apartment upon hearing the screams and had seen the victim lying on the floor and had knelt down beside her. He denied having touched her. The testimony that he did not touch the victim was contradicted by the facts that blood of a type similar to the victim's was found not only on the outside of defendant's pants and shirt but also on the inside of the crotch

areas of his pants, and hair similar to that of the victim was found on his clothing. Although no definite evidence of sexual intercourse was discovered, mucous-type stains were found on defendant's underwear, and the autopsy report showed that there were abrasions on the victim's thighs.

Defendant's confession was also corroborated by the fact that when making a composite sketch he had described someone looking very similar to himself and by his statement to the police officer when the similarity was called to his attention, that he thought they would have caught on sooner.

Defendant's voluntary confession, which was made approximately 12 hours after the crime took place, was substantially corroborated by physical evidence, and it stands in contrast to his testimony at trial which repeatedly contradicted his earlier statements. He had first told the people who called the police that he was coming home from work, but it was later confirmed that he had been visiting with a friend. Defendant had stated he observed a man come out of a side door, which was later proved to be locked from the inside. He had also given a detailed description of that man despite the facts that the area was dimly lit and the place he said he observed from was almost 70 feet away. He then testified there was no such man. Defendant first stated he did not go into the apartment, but later testified at trial that he went into the apartment and knelt down beside the victim but did not touch her.

■■ The determination of the credibility is an issue for the trier of fact, and a reviewing court will not reverse that determination unless the evidence presented is improbable, unconvincing or contrary to human experience. (*People v. Marichec* (1976), 41 Ill. App. 3d 604, 606, 353 N.E.2d 692.) After thoroughly reviewing the record we find nothing which would require reversal of defendant's conviction on the basis that he was not found guilty beyond a reasonable doubt.

■■ Defendant next contends there was a material variance between the indictment and the proof at trial because the indictment stated the murder had been committed with the use of a blunt instrument, and at trial there was not proof of a murder weapon or that defendant had used any such instrument. We do not find this contention to have merit inasmuch as the proof at trial established that defendant beat the victim to death with the use of an unknown blunt instrument. It should be noted that the State is under no duty to prove the identity of the weapon used. (*People v. Peterson* (1973), 10 Ill. App. 3d 1053, 295 N.E.2d 529 (abstract).) We also note that the allegations in the indictment were set out with sufficient particularity to inform defendant of the gist of the offense and it allowed defendant to prepare his defense and protected him against being prosecuted for the same crime at a later date. *People v.*

*Gregory* (1974), 59 Ill. 2d 111, 114, 319 N.E.2d 483; *People v. Coleman* (1971), 49 Ill. 2d 565, 571, 276 N.E.2d 721.

For these reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

JOHNSON, P. J., and DIERINGER, J., concur.